**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF  NEW YORK**
-----------------------------------------------------------------------X
ROADZEN, INC                                      :
                  Plaintiff            :
                                  :
     -against-                                  :     **AMENDED**
                                  :     **VERIFIED COMPLAINT**
                                  :     **File No.: 25-cv-07867(JPO)(GS)**
                                  :
METEORA CAPITAL PARTNERS, L.P., METEORA       :
SELECT TRADING OPPORTUNITIES MASTER, L.P.,    :
METEORA STRATEGIC CAPITAL, LLC, METEORA       :
CAPITAL, LLC, VIKAS MITTAL, JOSEPH LEVY,      :
KEVIN S GAHWYLER AND HENRY ROGANO             :
               Defendant(s).
-----------------------------------------------------------------------X

Plaintiff  ROADZEN,  INC. ("New Roadzen") by and through its attorneys,

Shayne Law Group, P.C. as for their Amended Verified Complaint against METEORA

CAPITAL PARTNERS, L.P. ("METEORA PARTNERS"), METEORA SELECT

TRADING OPPORTUNITIES MASTER, L.P. ("METEORA SELECT"), METEORA

STRATEGIC CAPITAL, LLC ("METEORA STRATEGIC"), METEORA CAPITAL,

LLC ('METEORA CAPITAL"), (Collectively "Meteora"), VIKAS MITTAL ("Mittal"),

JOSEPH LEVY ("Levy"), KEVIN S GAHWYLER ("Gahwyler") and HENRY

ROGANO ("Rogano"), (collectively, the "Defendants") respectfully allege the following

upon information and belief at all times hereinafter mentioned:

    **THE PARTIES**

1.   Plaintiff, Roadzen Inc., is a company incorporated in the British Virgin Islands, with

its principal place of business at 111 Anza Blvd., Burlingame, California 94010.

2.   Roadzen is a global insurance technology company and is listed on the Nasdaq under

the ticker symbol RDZN.

3.  Vahanna Tech Edge Acquisition I Corp. ("Vahanna"), was a special purpose

acquisition company ("SPAC") incorporated in the British Virgin Islands, with its

principal place of business in New York, New York.

4.  Roadzen, Inc. ("Old Roadzen") is a corporation organized under the laws of the State

of Delaware, with its principal place of business located at 111 Anza Blvd., Burlingame,

California 94010.

5.  Old Roadzen is a wholly owned subsidiary of Roadzen Inc. ("New Roadzen").

6.  On or about February 10, 2023, Vahanna and Roadzen, Inc. ("Old Roadzen") entered

into an Agreement and Plan of Merger pursuant to which Old Roadzen would merge with

Vahanna, with the combined company to be publicly traded on the Nasdaq exchange.

7.  On or about August 25, 2023, Vahanna announced that its shareholders had approved

the proposed business combination with Roadzen, Inc. ("Old Roadzen").

8.  On or about September 20, 2023, the merger was completed, and the new merged

company was named "Roadzen Inc." (" New Roadzen").

9.  Defendant, Meteora Partners is a Delaware Limited partnership.

10. Defendant Meteora Partners maintains a principal place of business located at 840 Park Dr.

East, Boca Raton, FL. 33432.

11. Defendant Meteora Partners maintains a principal place of business located at 1200 N.

Federal Highway, Boca Raton, FL 33432.

12. Defendant Meteora Partners maintains a principal place of business located at 250 W.

2

55th Street, Suite 30-a, New York, New York 10019.

13. Defendant, Meteora Partners is a SEC Registered Investment Advisor.

14. Defendant, Meteora Select is a Cayman Island Limited partnership.

15. Defendant Meteora Select maintains a principal place of business located at 840 Park Dr. East, Boca Raton, FL. 3343215.

16. Defendant, Meteora Select maintains a principal place of business located at 1200 N. Federal Highway, Boca Raton, FL 33432.

17. Defendant Meteora Select maintains a principal place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

18. Defendant, Meteora Select is a SEC Registered Investment Advisor.

19. Defendant, Meteora Strategic is a Delaware Limited partnership.

20. Defendant Meteora Strategic maintains a principal place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

21. Defended Meteora Strategic maintains a principal place of business located at 1200 N. Federal Highway, Boca Raton, FL 33432.

22. Defendant Meteora Strategic maintains a principal place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

23. Defendant, Meteora Strategic is a SEC Registered Investment Advisor.

24. Defendant, Meteora Capital is a Delaware Limited partnership.

25. Defendant Meteora Capital maintains a principal place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

26. Defended Meteora Capital maintains a principal place of business located at 1200 N. Federal Highway, Boca Raton, FL 33432

27.  Defendant Meteora Capital maintains a principal place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

28. Defendant Meteora Capital maintains offices in the State of New York.

29. Defendant, Meteora Capital is a SEC Registered Investment Advisor.

30. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Partners.

31. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Select.

32. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Strategic.

33. Defendant Mittal at all times hereinafter mentioned is the chief executive officer of Defendant Meteora Partners.

34. Defendant, Mittal resided at and still resides in the State of Florida.

35. Defendant, Mittal resided at and still resides in the State of New York.

36. Defendant, Mittal resided at and still resides in the State of California.

37. Defendant, Mittal maintained and still maintains a place of business in Florida.

38. Defendant, Mittal maintains and still maintains a place of business in New York.

39. Defendant, Mittal maintains and still maintains a place of business in California.

40. Defendant, Mittal maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

4

41. Defendant, Mittal maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

42. Defendant, Mittal maintains a place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

43. Defendant, Mittal is a member of Meteora Partners.

44. Defendant, Mittal is a Partner of Meteora Partners.

45. Defendant, Mittal is a managing member of Meteora Partners

46. Defendant, Mittal was a member of Meteora Partners.

47. Defendant, Mittal was a Partner of Meteora Partners.

48. Defendant, Mittal was a managing member of Meteora Partners

49. Defendant, Mittal is a member of Meteora Select.

50. Defendant, Mittal is a Partner of Meteora Select.

51. Defendant, Mittal is a managing member of Meteora Select

52. Defendant, Mittal was a member of Meteora Select.

53. Defendant, Mittal was a Partner of Meteora Select.

54. Defendant, Mittal was a managing member of Meteora Select

55. Defendant, Mittal is a member of Meteora Strategic.

56. Defendant, Mittal is a Partner of Meteora Strategic.

57. Defendant, Mittal is a managing member of Meteora Strategic.

58. Defendant, Mittal was a member of Meteora Strategic.

59. Defendant, Mittal was a Partner of Meteora Strategic.

60. Defendant, Mittal was a managing member of Meteora Strategic.

61. Defendant, Mittal is a member of Meteora Capital.

62. Defendant, Mittal is a Partner of Meteora Capital.

63. Defendant, Mittal is a managing member of Meteora Capital.

64. Defendant, Mittal was a member of Meteora Capital.

65. Defendant, Mittal was a Partner of Meteora Capital.

66. Defendant, Mittal was a managing member of Meteora Capital.

67. Defendant, Mittal is an SEC Registered Investment Advisor.

68. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Partners.

69. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Select.

70. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Strategic.

71. Defendant Levy at all times hereinafter mentioned is the chief financial officer of Defendant Meteora Capital.

72. Defendant Levy at all times hereinafter mentioned is the chief operating officer of Defendant Meteora Partners.

73. Defendant Levy at all times hereinafter mentioned is the chief operating officer of Defendant Meteora Select.

74. Defendant Levy at all times hereinafter mentioned is the chief operating officer of Defendant Meteora Strategic.

75. Defendant Levy at all times hereinafter mentioned is the chief operating officer of Defendant Meteora Capital.

76. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Partners.

77. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Select.

78. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Strategic.

79. Defendant Levy at all times hereinafter mentioned is the chief compliance officer of Defendant Meteora Capital.

80. Defendant, Levy resided at and still resides in the State of Florida.

81. Defendant, Levy resided at and still resides in the State of New York.

82. Defendant, Levy resided at and still resides in the State of California.

83. Defendant, Levy maintained and still maintains a place of business in Florida.

84. Defendant, Levy maintains and still maintains a place of business in New York.

85. Defendant, Levy maintains and still maintains a place of business in California.

86. Defendant, Levy maintains and still maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

87. Defendant, Levy maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

88. Defendant, Levy maintains a place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

89. Defendant, Levy is a member of Meteora Partners.

90. Defendant, Levy is a Partner of Meteora Partners.

91. Defendant, Levy is a managing member of Meteora Partners

92. Defendant, Levy was a member of Meteora Partners.

93. Defendant, Levy was a Partner of Meteora Partners.

94. Defendant, Levy was a managing member of Meteora Partners

95. Defendant, Levy is a member of Meteora Select.

96. Defendant, Levy is a Partner of Meteora Select.

97. Defendant, Levy is a managing member of Meteora Select

98. Defendant, Levy was a member of Meteora Select.

99. Defendant, Levy was a Partner of Meteora Select.

100. Defendant, Levy was a managing member of Meteora Select

101. Defendant, Levy is a member of Meteora Strategic.

102. Defendant, Levy is a Partner of Meteora Strategic.

103. Defendant, Levy is a managing member of Meteora Strategic.

104. Defendant, Levy was a member of Meteora Strategic.

105. Defendant, Levy was a Partner of Meteora Strategic.

106. Defendant, Levy was a managing member of Meteora Strategic.

107. Defendant, Levy is a member of Meteora Capital.

108. Defendant, Levy is a Partner of Meteora Capital.

109. Defendant, Levy is a managing member of Meteora Capital.

110. Defendant, Levy was a member of Meteora Capital.

111. Defendant, Levy was a Partner of Meteora Capital.

112. Defendant, Levy was a managing member of Meteora Capital.

113. Defendant, Levy is an SEC Registered Investment Advisor.

114. Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Partners.

115. Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Select.

116. Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Strategic.

117. Defendant Rogano at all times hereinafter mentioned is the Sr Investment Advisor of defendant Meteora Capital.

118. Defendant, Rogano resided at and still resides in the State of Florida.

119. Defendant, Rogano resided at and still resides in the State of New York.

120. Defendant, Rogano resided at and still resides in the State of California.

121. Defendant, Rogano maintained and still maintains a place of business in Florida.

122. Defendant, Rogano maintains and still maintains a place of business in New York.

123. Defendant, Rogano maintains and still maintains a place of business in California.

124. Defendant, Rogano maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

125. Defendant, Rogano maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

126. Defendant, Rogano maintains a place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

127. Defendant, Rogano is a member of Meteora Partners.

128. Defendant, Rogano is a Partner of Meteora Partners.

129.    Defendant, Rogano is a managing member of Meteora Partners

130.    Defendant, Rogano was a member of Meteora Partners.

131.    Defendant, Rogano was a Partner of Meteora Partners.

132.    Defendant, Rogano was a managing member of Meteora Partners

133.    Defendant, Rogano is a member of Meteora Select.

134.    Defendant, Rogano is a Partner of Meteora Select.

135.    Defendant, Rogano is a managing member of Meteora Select

136.    Defendant, Rogano was a member of Meteora Select.

137.    Defendant, Rogano was a Partner of Meteora Select.

138.    Defendant, Rogano was a managing member of Meteora Select

139.    Defendant, Rogano is a member of Meteora Strategic.

140.    Defendant, Rogano is a Partner of Meteora Strategic.

141.    Defendant, Rogano is a managing member of Meteora Strategic.

142.    Defendant, Rogano was a member of Meteora Strategic.

143.    Defendant, Rogano was a Partner of Meteora Strategic.

144.    Defendant, Rogano was a managing member of Meteora Strategic.

145.    Defendant, Rogano is a member of Meteora Capital.

146.    Defendant, Rogano is a Partner of Meteora Capital.

147.    Defendant, Rogano is a managing member of Meteora Capital.

148.    Defendant, Rogano was a member of Meteora Capital.

149.    Defendant, Rogano was a Partner of Meteora Capital.

150.    Defendant, Rogano was a managing member of Meteora Capital.

151.    Defendant, Rogano is an SEC Registered Investment Advisor.

10

152.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Partners.

153.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Select.

154.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Strategic.

155.    Defendant Gahwyler at all times hereinafter mentioned is the Financial Advisor of Defendant Meteora Capital.

156.    Defendant, Gahwyler resided at and still resides in the State of Florida.

157.    Defendant, Gahwyler resided at and still resides in the State of New York.

158.    Defendant, Gahwyler resided at and still resides in the State of California.

159.    Defendant, Gahwyler maintained and still maintains a place of shares of Roadzen stock in Florida.

160.    Defendant, Gahwyler maintains and still maintains a place of shares of Roadzen stock in New York.

161.    Defendant, Gahwyler maintains and still maintains a place of shares of Roadzen stock in California.

162.    Defendant, Gahwyler maintains a place of business located at 840 Park Dr. East, Boca Raton, FL. 33432.

163.    Defendant, Gahwyler maintains a place of business located at 1200 N. Federal Highway, Boca Raton, FL. 33432.

11

164. Defendant, Gahwyler maintains a place of business located at 250 W. 55th Street, Suite 30-a, New York, New York 10019.

165. Defendant, Gahwyler is a member of Meteora Partners.

166. Defendant, Gahwyler is a Partner of Meteora Partners.

167. Defendant, Gahwyler is a managing member of Meteora Partners

168. Defendant, Gahwyler was a member of Meteora Partners.

169. Defendant, Gahwyler was a Partner of Meteora Partners.

170. Defendant, Gahwyler was a managing member of Meteora Partners

171. Defendant, Gahwyler is a member of Meteora Select.

172. Defendant, Gahwyler is a Partner of Meteora Select.

173. Defendant, Gahwyler is a managing member of Meteora Select

174. Defendant, Gahwyler was a member of Meteora Select.

175. Defendant, Gahwyler was a Partner of Meteora Select.

176. Defendant, Gahwyler was a managing member of Meteora Select

177. Defendant, Gahwyler is a member of Meteora Strategic.

178. Defendant, Gahwyler is a Partner of Meteora Strategic.

179. Defendant, Gahwyler is a managing member of Meteora Strategic.

180. Defendant, Gahwyler was a member of Meteora Strategic.

181. Defendant, Gahwyler was a Partner of Meteora Strategic.

182. Defendant, Gahwyler was a managing member of Meteora Strategic.

183. Defendant, Gahwyler is a member of Meteora Capital.

184. Defendant, Gahwyler is a Partner of Meteora Capital.

185. Defendant, Gahwyler is a managing member of Meteora Capital.

186. Defendant, Gahwyler was a member of Meteora Capital.

187. Defendant, Gahwyler was a Partner of Meteora Capital.

188. Defendant, Gahwyler was a managing member of Meteora Capital.

189. Defendant, Gahwyler is an SEC Registered Investment Advisor.

190. Defendant, Gahwyler is a certified public accountant.

191. Defendant, Gahwyler is a certified public accountant licensed in the State of New York.

192. Defendant, Gahwyler is a certified public accountant licensed in the State of Florida.

193. Meteora Capital LLC is an affiliate of Meteora Partners.

194. Meteora Capital LLC is an affiliate of Meteora Select.

195. Meteora Capital LLC is an affiliate of Meteora Strategic.

196. Meteora Select is owned in whole or in part by Meteora Capital, LLC.

197. Meteora Strategic is owned in whole or in part by Meteora Capital, LLC.

198. Meteora Partners is owned in whole or in part by Meteora Capital, LLC.

199. Meteora Select is controlled in whole or in part by Meteora Capital, LLC.

200. Meteora Strategic is controlled in whole or in part by Meteora Capital, LLC.

201. Meteora Partners is controlled in whole or in part by Meteora Capital, LLC.

## **JURISDICTION AND VENUE**

202. This court has jurisdiction over the issues raised in this complaint pursuant

to 28 USC §1332 in that the matter in controversy exceeds $75,000 and the Defendants maintain a principal place of business in a state other than the state in which the Plaintiff maintains its principal place of business.

203. This court has jurisdiction over the issues raised in this complaint pursuant to 18 USC §1964(c) in that this is an action brought pursuant to 18 USC §§ 1961-1968.

204. This court has jurisdiction over the issues raised in this complaint in that this is an action brought pursuant to 15 USC §§17(a), 77q(w), 78(b) and SEC Rule 10(b) and 10b-5.

205. The venue is properly found in this court pursuant to 28 USC §1391(b) and (c).

206. The venue is properly found in this court pursuant to 18 USC §1965

### FACTS APPLICABLE TO ALL CLAIMS

207. On about April 22, 2021 Vahanna Tech Edge Acquisition I Corp "Vahanna" was formed as a "Special Purpose Acquisition Company" (hereinafter a "SPAC") in the British Virgin Islands.

208. A SPAC is a shell corporation listed on a stock exchange with the purpose of acquiring or merging with a private operating company with results being that the operating company is publicly traded on an exchange.

209. On about November 23, 2021 Vahanna was first listed on the NASDAQ exchange.

210. The proceeds of the sale of Vahanna stock was deposited in a trust account.

**THE SCHEME:**

211. Defendants are in the business of Funding SPAC companies.

212. Typically, after a SPAC company acquires and or merges with a private

14

operating company, the newly merged company from time to time will require operating capital with the expectation that the shares listed on the public market can be sold to provide capital to the company.

213. Defendants are in the business of funding companies that are newly operating after a merger with a SPAC company

214. As a practical matter a newly listed company on a stock exchange will require capital to fund its expansion and growth.

215. Generally funding for the expansion of a business comes in the form of either capital contribution by selling shares or in the form of a loan.

216. Based upon the foregoing, Defendants devised a "funding scheme" to satisfy the requirements of the cash flow needs of a listed company following a merger between a non-listed/private operating company and a SPAC.

217. Step I of the funding scheme devised by Defendants required the Defendants to purchase shares of the SPAC prior to the merger.

218. Step II of the funding scheme devised by Defendants required the post merged company to have a limited supply of unrestricted shares that could be sold in the market.

219. Step III of the funding scheme devised by Defendants required the newly merged post SPAC company to return to Defendants 100% of the money that was spent by Defendants prior to the merger to acquire the shares of the SPAC, thereby giving Defendants a zero-cash basis for all the acquired stock.

220. As part of Step III of Defendants' scheme, notwithstanding the return of 100% of the money Defendants' spent to acquire the shares of the SPAC, Defendants retained "legal ownership" of the shares essentially as collateral security for the future money to

15

be paid by Defendants to the newly merged company and further required the issuance of "restricted" shares to be issued by the newly merged company without further compensation.

221. Step IV of the funding scheme devised by Defendants required the Defendants to periodically sell shares it held as collateral security and remit part of the sales proceeds to the newly merged company.

222. As part of Step IV of Defendants' scheme, the parties pre-agreed on a "strike price" or "reference price" that would be paid to the newly listed merged company upon the sale of any portion of the stock which was being held by Defendants and Defendants would retain the remainder as their profit.

223. As part of the Step IV calculation, in reaching the "strike price" Defendants also had to make a calculation of how many shares of stock could be sold without driving the price downward based upon the supply of shares available to be sold (which is often referred to as the "float").

224. Step V of the funding scheme devised by Defendants, permitted the Defendant to sell shares of unrestricted stock on the listed exchange at any price but requiring defendant to pay to the newly merged company the "strike price" per share.

225. As a practical matter, it is assumed that Defendants would sell shares above the "Strike Price" otherwise Defendants would bear a loss on each sale of shares.

226. The result of the foregoing scheme was that the newly merged company would receive cash for expansion without incurring debt.

227. In addition to the foregoing, Defendants devised a "Step VI" of the Funding scheme in the event the stock price went below the pre-designated strike price.

228. Step VI of the scheme devised by the Defendants permitted payments by Defendants to the newly merged company, usually in increments of $500,000 and Defendants would be contractually permitted to sell a sufficient number of shares that were being held in escrow at the then market price [usually below the "strike price"] sufficient to repay the money to Defendants that were paid to the newly merged company plus an additional 17%.

229. As part of the scheme devised by the Defendants, Defendants would agree to limit the number of shares that it would sell in the market to avoid any stock manipulation in violation of SEC rules and regulations.

230. Notwithstanding the stated goal of avoiding stock manipulation in violation of SEC rules and regulations, Defendants' required free reign to use their discretion when they could and should sell the stock that was being held as collateral security and the quantity of stock that Defendants were permitted to sell.

231. To induce Defendants' "Target" company to enter into the proposed "funding" scheme as outlined hereinabove, Defendants' proposed both accountability to the "Target" company and practical financial disincentives to avoid the "cratering" of the stock price of the "Target" company.

232. The practical financial disincentive to avoid "cratering" the stock price of the "Target" company is the provision in the proposed funding agreement , that regardless of the price at which a share is sold, Defendants would be obligated to pay a pre-agreed "strike price" or "reference price" per share sold.

233. Based upon the foregoing practical motivation, any reasonable business person

would only sell shares at or above the pre-agreed "strike price" or "reference price" in that selling shares below the pre-agreed "strike price" would require payment to the "Target" company of an amount greater than received for the sale of the stock.

234.   The accountability proposed by Defendants to the "Target" companies was the representation that  Defendants would provide a true and accurate reporting of their shareholding in the "Target" Company's shares at any time requested by the "Target" company.

235.   As part of the scheme devised by the Defendants, the "strike price" could be lowered under certain pre-designated events.

236.   Further, notwithstanding the contractual right to have discretion as to the time and number of shares to be sold from the escrowed shares, as part of the scheme devised by Defendants, Defendants would agree to an initial "stand-down period" to allow the price of the stock of the newly traded merged Company to "organically" go up or down from the initial offering price to avoid any SEC violations.

237.   The "trap" for the "Target" company is that by manipulating the price of the Target companies shares, under a number of different complicated set of circumstances, Defendants would claim to have the right to "reset" the "strike price" at a lower price than Defendants had actually sold shares, which would result in a "windfall" to Defendants.

**ROADZEN IS THE SUBJECT OF DEFENDANTS' SCHEME:**

238.   On about February 10, 2023 Vahanna and Roadzen, Inc. (" Old Roadzen") a Delaware registered company in the Global Insurance Technology business entered into an "Agreement and Plan of Merger".

18

239. Thereafter, but prior to August 25, 2023 Defendants proposed to Vahanna that it enter into what Defendants called a "Forward Share Purchase Agreement".

240. In fact what was proposed was for Vahanna after finalizing its merger with "Old Roadzen" to enter into the funding "Scheme" as set forth hereinabove.

241. More particularly Defendants issued a term sheet to Vahanna in which the following proposal and representations were made:

    a. Meteora would acquire 5,000,000 SPAC shares for approximately $54,000,000;

    b. Meteora shall pay to Vahanna at the closing of the shares of Roadzen stock combination [the merger] 2.5% of the transaction's value with "shortfall sales" no sooner than 30 days post-closing;

    c. Early termination of the funding agreement should the company get "delisted" from the exchange;

    d. Early termination of the funding agreement should the price of the stock trade below $2.00/share for 30 consecutive days;

    e. A commitment fee of 100,000 shares of the newly listed stock;

    f. A representation that Defendants could only sell shares of the stock that it was holding for a price in excess of $10.00/share [which was designated the "reference price"];

    g. Defendant could not "short" the company securities;

    h. That the legal fee to be paid by Vahanna would be capped at $50,000.00;

      i.   That Vahanna would transfer the "FSPA" proceeds, less the prepayment shortfall to Defendants' pre-segregated bank account [basically the proceeds Defendants paid for the 5,000,000 shares as described above];

      j.   Upon the sale of any shares by Defendants, Defendants would pay to Plaintiff the "reference price" per share sold [which in the initial written proposal was $10.00/share];

         [annexed as Exhibit "A" is a copy of the Term Sheet issued by Defendants to Vahanna]

242. Based upon the expected funding needs of the newly merged company, Vahanna and "Old Roadzen" agreed that the newly merged business should enter into the proposed funding agreement with Defendants as proposed.

243. On or about August 25, 2023 Vahanna announced that its shareholders had approved the stock combination with Roadzen, Inc. (" Old Roadzen").

244. Or about August 25, 2023 Defendants, Vahanna and "Old Roadzen" entered into a funding agreement that was described as a "Share Forward Transaction" or "Forward Purchase Agreement".

245. The funding agreement entered into with Defendants provided the following:

      k.   Meteora would acquire 5,000,000 SPAC shares;

      l.   that the number of shares held by Defendants would represent no more than 9.9% of the total Public float at the closing date of the merger;

m. Early termination of the funding agreement should the company get "delisted" from the exchange;

n. Early termination of the funding agreement should the price of the stock trade below $1.00/share for 30 consecutive days;

o. A representation that Defendants could sell shares of the stock at any price, but would be required to pay the Plaintiff $10.76/share sold [which was designated the "reference price"];

p. Defendant could not "short" the company securities;

q. After the merger date the number of shares of stock Defendant was permitted to sell was limited;

r. Defendant was required to give Plaintiffs written notice of all sales of stock within 5 business days;

s. That the legal fee to be paid by Vahanna would be capped at $50,000.00;

t. That Vahanna would transfer the sum of $46.19 million to Defendants' pre-segregated bank account which equaled the proceeds Defendants paid for the 5,000,000 shares as described above in which event Defendants' "cost-basis" in the shares held was $0.00;

u. Upon the sale of shares by Defendants, Defendants was required to pay to Plaintiff the "reference price" per share sold which was defined as $10.76/share;

v. In the event share(s) were sold at a price in excess of the "reference price" of $10.76/share, Defendants would retain the excess proceeds of each such sale;

w. In the event Defendants sold any share below the "reference price" of $10.76/share, Defendant was still obligated to remit the sum of $10.76/share to Plaintiff;

x. The number of shares Defendants could sell during the first 180 days following the closing were limited;

y. The term of the agreement expired in March 2025 at which time Plaintiff would purchase from Defendants all remaining shares held by Defendants at $1.25/share.

246. Before the merger between Vahanna and "Old Roadzen", Defendants purchased Vahanna stock as provided for in the agreement.

247. On or about September 20, 2023, the merger was completed, and the new merged company was named "Roadzen Inc." (" New Roadzen").

248. Upon the merger of Vahanna and "Old Roadzen", Defendants received 4,297,745 shares of the new merged company in exchange for the shares of the SPAC that it had purchased pre-merger.

249. To comply with the funding agreement with Defendants, 702,255 of restricted shares of Plaintiff "New Roadzen" were issued to Defendants, Meteora after which Defendants, Meteora were holding 5,000,000 shares of Plaintiff.

250. Meteora did not pay any cash to New Roadzen for the issuance of these 702,255 shares.

22

251. In compliance with the funding agreement with Defendants, Plaintiff paid back / reimbursed Defendants, Meteora the sum of $46,190,195.09 that Meteora had spent for the purchase of 4,297,745 shares of the SPAC.

252. As a result, Defendants were holding 5,000,000 shares of Plaintiff at a $0.00 cost basis of which 4,297,745 were "unrestricted" shares and could be sold in the market immediately after the merger occurred and the shares were issued.

253. In furtherance of Defendant's scheme, the number of unrestricted shares that were permitted to be sold following the merger were limited, resulting in a limited supply.

254. While Defendants held approximately 9.9% of the issued stock of "New Roadzen", Defendants held an overwhelming majority of unrestricted shares of New Roadzen stock that could be sold on the NASDAQ exchange and therefore had significant control over the "float" of the stock and had the ability to move the stock price.

255. Initially after the merger on September 20, 2023, the  share price of Plaintiff on the NASDAQ exchange went up to as high as $17/share.

256. From the date of the merger and transfer of the shares of "new" Roadzen Stock to Defendants, Meteora on or about September 20, 2023 until September 30, 2023 Defendants, Meteora sold 206,763 shares of Roadzen stock.

257. Meteora remitted to New Roadzen $10.76 per share for the sale of the 206,763 shares sold as contemplated in the agreement.

258. From October 1, 2023 until December 31, 2023 Defendants, Meteora sold 3,386 shares of New Roadzen stock.

23

259.    Based upon the oral representations made by Defendants, which were incorporated in the agreements between the parties, Plaintiff had a reasonable expectation that Defendants would be selling some New Roadzen shares of stock in the market in which event Defendants would remit to Plaintiff the sum of $10.76 per share sold, which funds would be available for use as operating capital of the newly merged company.

260.    Based upon the representations and circumstances surrounding the agreements, Defendants knew that Plaintiff was relying upon Defendants to sell "some" of the 5,000,000 New Roadzen shares being held by Defendants when the share price was above $10.76 per share.

261.    Defendants knew that it was reasonable for Plaintiff to rely upon Defendants representations in that it would not make economic sense for Defendant to sell New Roadzen shares in the market when the price was below $10.76 per share, by reason of the contractual requirement that Defendant was obligated to remit to Plaintiff $10.76 for each share sold.

262.    Defendants knew that Plaintiff expected Defendants to disclose to Plaintiffs the time and the number of New Roadzen shares being sold whenever  Defendants elected to sell shares in the market.

263.    Defendants knew that Plaintiff expected Defendants to disclose to Plaintiffs whether Defendants were selling shares of New Roadzen stock to cover prepayments or when the share price was above $10.76 per share in which event Defendant was required to remit those funds to Plaintiff.

264.    It was reasonable that Plaintiff expected Defendant to disclose to Plaintiff all sales of the New Roadzen shares of stock it was holding to Plaintiff.

265.    By reason of the fact that the contracts between Plaintiff and Defendant provided that Defendant was required to disclose to Plaintiff all sales of New Roadzen stock, it was reasonable to expect that Defendant would comply with the terms and conditions of the contract and disclose all sales of stock.

266.    It was reasonable that Plaintiff expected Defendants not to fail to disclose or make any misrepresentations as to when and the number of shares of New Roadzen stock that were being sold.

267.    It was reasonable that Plaintiff expected Defendants to remit to Plaintiff the sum of $10.76/share for every share of New Roadzen that Defendants sold except for sales as provided for in the amended agreement between the parties as set forth in more detail hereinbelow.

268.    Defendants were aware that Plaintiff was relying upon the funds expected to be received from Defendants pursuant to the agreements upon the sale of the shares of New Roadzen that Defendants were holding pursuant to the above-described scheme to fund some of New Roadzen's operating costs.

269.    Notwithstanding the reasonableness of the foregoing and Defendants' knowledge of the reasonableness of the foregoing, Defendants intended to withhold the sale of sufficient shares regardless of whether or not the market price exceeded $10.76, and further Defendants did not intend to remit the necessary funds to Plaintiff to fund the operating expenses required by Roadzen as it sold shares of stock that it was holding pursuant to the outlined "scheme".

270.    Defendants represented from time to time to Plaintiff that Defendants, Meteora

25

had sold a certain number of Roadzen shares, and that the remaining shares remained in their possession.

271. The representations made by the Defendants, both orally and in emails, were false.

272. Defendants knew that the foregoing representations were false.

273. Defendants knew that the Plaintiff was relying upon the truth of the representations and as a result Plaintiff was induced into entering into the sale of the Roadzen stock arrangement as outlined hereinabove.

274. Defendants did sell some shares of Plaintiff's stock in the market and profited from those sales.

275. Defendant's failed to remit funds to Plaintiffs as was required by the agreements between the parties.

276. Defendants repeatedly misrepresented to Plaintiff the number of Plaintiff's shares held by Defendants to obscure the fact that Defendants had sold shares in the market that had not been disclosed as required by the agreements between the parties.

277. By reason of the foregoing, Plaintiff was damaged.

278. In addition to the foregoing, contrary to the agreement with Plaintiff, Defendants sold sufficient number of shares in a short period of time such that Defendants sale of shares significantly affected the market price of Roadzen shares.

279. As a result of Defendants stock manipulation, the price of the Roadzen stock decreased below $10 per share.

280. The price per share of Roadzen stock never rebounded above the pre-agreed strike price of $10.76 per share.

281.    The 13F filings by Defendants for the period ending 12/31/2023, which was not filed until February 14, 2024 reported that as of 12/31/2023 Defendants held 4,087,596 shares of Roadzen stock.

282.    As of September 20th, 2023 Defendants held 4,297,745 shares of unrestricted New Roadzen stock.

283.    Based upon the 13F filing, Defendants sold no less than 210,149 shares of Roadzen stock prior to the amendment to the agreement on January 30, 2024.

284.    Other than as set forth herein, prior to January 30, 2024 Defendants failed to make the payments to Plaintiff as provided for in the agreements.

285.    Prior to January 30, 2024 Defendants failed and refused to disclose to Plaintiff the number of shares sold and the price received for the sale of each share sold including but not limited to the sales that would require payment to Plaintiff.

286.    Prior to January 30, 2024, over 4,000,000 shares of Roadzen stock were available to Defendants to be sold to provide Plaintiff, Roadzen with sufficient operating capital, as was the intent of the agreements entered into between Plaintiff and Defendants.

287.    Defendant did not remit it's 13F filings for the period ending 12/31/2023 until February 14, 2024 and Defendants intentionally failed and/or refused to advise Plaintiff of the sales of stock to Plaintiffs prior to the date  the amendment to the parties agreement was entered into.

288.    By reason of the foregoing Plaintiff was unaware of the number of shares sold by Defendants and Plaintiff was unaware of the amount the Defendants were obligated to pay Plaintiff pursuant to the agreements between the parties prior to the date the amendment to the parties agreement was entered into.

27

289.    Unaware that Defendants had sold unreported stock from the "escrowed" stock held pursuant to the agreements and unaware of the amount that Plaintiff was entitled to receive from Defendants pursuant to the agreements, Plaintiff approached Defendants with regard to obtaining some financial assistance.

290.    As a result, on about January 30, 2024 Plaintiff and Defendants, Meteora. entered into an amendment to the funding agreement, that was titled: Forward Purchase Agreement Confirmation Amendment ( the "Amendment"), a copy of which is attached to as exhibit "B".

291.    The amendment to the funding agreement provided that:

> a.  notwithstanding the share price on the NASDAQ exchange, Plaintiff could request advances of funds up to a total of $5 million in $500,000 increments on an as requested basis;
>
> b.   Defendants were required to advance the requested funds to Plaintiff; and
>
> c.  Defendants were thereafter permitted to sell sufficient shares of the Roadzen stock that was being held in escrow at the then market price to reimburse itself for the money it advanced to Plaintiff plus a 17% "fee".

292.    By reason of the foregoing, whenever Defendants "advanced funds" to Plaintiff pursuant to the amended funding agreement, Defendant was permitted to sell shares of Roadzen stock at any market price until such time as the amount advanced plus 17% was realized from the sale of the stock.

293.    With regard to the shares sold pursuant to the Amendment to the Funding

28

Agreement, Defendant was not obligated to pay to Plaintiff the "reference price" of $10.76 per share

294.    Notwithstanding the foregoing, once Defendant had been reimbursed for the amount advanced to Plaintiff plus 17% of the amount advanced, all further sales by Defendant of Roadzen stock required the payment of $10.76 per share sold.

295.    Over the next few months, a total sum of approximately$2.6 million was paid/advanced to Plaintiff pursuant to the amended agreement.

296.    After each payment to Plaintiff, upon information of belief, Defendant sold sufficient shares of Roadzen stock that it was holding in escrow as collateral security to reimburse Defendants for the money it paid to Roadzen plus 17%.

297.    Notwithstanding the terms and conditions of the Amendment and the fact that less than $5,000,000 had been advanced/paid to Plaintiff by Defendants, upon a request for a $500,000 payment as provided by the Amendment, Defendant failed and refused to advance the funds as requested by Plaintiff.

298.    When Defendants refused to advance the requested funds, Defendants were well aware of the immediate need Plaintiff had for the funds to meet immediate operating expenses.

299.    When Defendants refused to advance the requested funds, Defendants were well aware that Plaintiff would be required to obtain funds from other sources including advances from its other shareholders to meet its immediate cash needs.

300.    When Defendants refused to advance the requested funds, Defendants were well aware that if Plaintiff obtained funds from other sources, pursuant to the terms of the original agreement, the $10.76 strike price would/could be reset, thus allowing

Defendants to pay to Plaintiff a per share price significantly lower upon the sales of stock thus saving Defendants millions of dollars.

301. By reason of Defendants' wrongful refusal to advance money pursuant to the "Amendment", Defendants waived the right to reset the "strike price".

302. With respect to the shareholding of Roadzen stock by the Defendants, Defendants were considered an "institutional owner".

303. As an institutional owner of shares, Defendants were required to file quarterly reports of their shareholding in Roadzen stock.

304. The quarterly reports required to be filed by defendants are known as 13F filings, which filings are available to the public.

305. Annexed as Exhibit C is a published summary report of the disclosed 13F filings by Defendants setting forth the number of Roadzen shares that were held by Defendants in each quarter beginning immediately after the merger when the Roadzen stock began trading on the NASDAQ exchange.

306. The public 13F filings revealed the following:

| Effective date of filing | Date 13F filed | #shares held by Meteora |
|---|---|---|
| 9/30/2023 | 11/13/2023 | 4,090,982 shares |
| 12/31/2023 | 2/14/2024 | 4,087,596 shares. |
| 3/31/2024 | 5/14/2024 | 4,625,311 shares. |
| 6/30/2024 | 8/14/2024 | 4,026,221 shares |
| 9/30/2024 | 11/14/2024 | 3,138,628 shares |
| 12/31/2024 | 2/14/2025 | 2,091,102 shares. |
| 3/31/2025 | 5/15/2025 | 1,267,163 shares |

307. From the date of the merger on September 26, 2023 to the signing of the amendment agreement (Exhibit B) on January 30, 2024 Defendants failed to remit the proper amount of money to Plaintiff as required by the agreement between the parties.

30

308. From the date of the merger on September 26, 2023 to the signing of the amendment agreement (Exhibit B) on January 30, 2024. Defendants failed to sell a sufficient number of shares of New Roadzen in the market to provide Plaintiff with the required funds as contemplated by the agreements between the parties.

309. Pursuant to the original agreement between Plaintiff and Defendants, of the total 5 million shares held in escrow as collateral security as described hereinabove; 4,297,745 shares were unrestricted shares.

310. As provided for in the agreements as amended on January 30, 2024, except for those shares sold for the purposes of reimbursing Defendant for the funds advanced to Plaintiff as permitted in the amendment to the agreement, plus the 17% fee to defendants, all other shares sold by defendants required defendant to remit to plaintiff $10.76 per share.

311. On about July 2, 2024 Defendant Levy sent an email to Plaintiff in which Levy represented that Defendants sold a total of 880,610 shares of Roadzen, Inc. that was utilized to repay defendants the entire prepayment amount remitted to Plaintiff, inclusive of the 17% fee.

312. Based upon the initial shareholding of 5,000,000 shares, and based upon the foregoing representation by Defendant, Levy that 880,610 shares were sold to cover this so-called "short fall requests" and further based upon the most recent 13F filing as of March 31, 2025 in which it was reported that Defendants held 1,267,163 shares of Roadzen stock, Defendants effectively reported that from September 2023 through March 31, 2025 2,645,464 shares were sold for which defendant should have remitted to plaintiff the sum of $10.76 per share.

31

313.    By reason the foregoing, as of March 31, 2025 Defendants failed to pay to

Plaintiff pursuit to the agreements the total sum of $28,465,192.64 calculated as follows:

5,000,000 Initial restricted and unrestricted shares less (880,610) shares used to pay the "prepayment shortfall", less (1,267,163) shares held by Defendants as of 3/31/25 per the 13F filing, less the 206,763 shares sold as of 12/31/23 from which Defendants remitted the agreed sum to Roadzen:
   = 2,645,464 shares sold by Defendants X $10.76= $28,465,192.64

314.    Upon information and belief, Defendants do not deny that shares of Roadzen were

sold, that Defendants received payment for the sale of shares of Roadzen and that

Defendants did not remit the full payment to Plaintiff as provided by the Agreements.

## OTHER COMPANIES HAVE BEEN LURED INTO DEFENDANTS FRAUDULENT SCHEME AND BEEN SIMILARLY DAMAGED

315.    Prior to October 12, 2022 Clean Earth Acquisition Corp (" Old Alternus"), a

Delaware registered company was formed as a SPAC for the purpose of acquiring an

operating business or merging with an operating business or acquiring the assets of an

operating business.

316.    On about October 12, 2022 Clean Earth Acquisition Corp (" Old Alternus") a

Delaware registered company and Alternus Energy Group Plc ("Alternus-Ireland"), a

transatlantic clean energy power producer, registered in Ireland and publicly traded on

various European stock exchanges entered into a "Business Combination Agreement",

which agreement was amended on April 12, 2023 in which various United States assets

of Alternus-Ireland would be transferred to "Old Alternus", Old Alternus's name would

be changed from Clean Earth Acquisition Corp to Alternus Clean Energy Inc. ("New

32

Alternus"), 80% of the shares of stock of Old Alternus would be transferred to Alternus-Ireland and New Alternus would become listed on the NASDAQ exchange.

317.    Thereafter, but prior to December 3, 2023 Defendants proposed to "Old Alternus" that it enter into what Defendants called a "Forward Share Purchase Agreement".

318.    In fact what was proposed was for Old Alternus, after finalizing the proposed "Business Combination" with "Alternus Ireland" to enter into the funding "Scheme" as set forth hereinabove.

319.    More particularly Defendants issued a term sheet to Old Alternus in which the following proposal and representations were made:

> a.  Meteora would acquire approximately 3,000,000 SPAC shares [shares of Old Alternus] on the open market;
>
> b.  Old Alternus would be required to pay an early termination fee should the company get "delisted from the exchange;
>
> c.  Early termination of the funding agreement should the price of the stock trade below $1.00/share for 30 consecutive days;
>
> d.  A representation that Defendants could only sell shares of the stock that it was holding for a price in excess of $10.00/share [which was designated the "reference price" or the "shortfall price"];
>
> e.  Defendant could not "short" the company securities;
>
> f.  That the legal fee to be paid by Vahanna would be capped at $50,000.00;

33

g. That New Alternus would transfer back to Defendants' designee the proceeds Defendants paid for the 3,000,000 shares [as described above]; and

h. Upon the sale of shares by Defendants, Defendants would pay to Plaintiff the "reference price" ["shortfall price'] of $10.00 per share sold;

320. Or about December 3, 2023 Defendants, Old Alternus and Alternus Ireland entered into a funding agreement that was described as a "Share Forward Transaction".

321. The funding agreement entered into with Defendants provided the following:

a. Meteora would acquire 3,000,000 SPAC shares;

b. That the number of shares held by Defendants would represent no more than 9.9% of the total public float at the closing date of the merger.

c. Early termination of the funding agreement should the company get "delisted" from the exchange;

d. Early termination of the funding agreement should the price of the stock trade below $1.00/share for 30 consecutive days;

e. A representation that Defendants could only sell shares of the stock that it was holding for a price in excess of $10.00/share [which was designated the "reference price" and also sometimes referred to as the "Prepayment Shortfall"] during the first 90 days after New Alternus began trading on the NASDAQ exchange and Defendants were permitted to retain any excess proceeds of each sale;

34

f.  Defendant could not "short" the company securities;

g.  Defendant could sell shares during the first 90 days following the date the company began trading on the NASDAQ exchange so long as the sale price was in excess of $10.00/share.

h.  Defendants agreed to advance $500,000.00 to New Alternus upon consummation of the Forward Funding Agreement.

i.  After the first 90 days, Defendants were permitted to sell shares to reimburse themselves sufficiently to repay Defendants the $500,000.00 advanced plus a 17% fee and was required to give New Alternus written notice of the sale within 5 business days;

j.  After Defendants were reimbursed for the $500,000.00 "advanced" plus 17%, Defendants were prohibited from selling any further shares for less than $10.00/share unless and until New Alternus agreed to change the "reference price/prepayment shortfall".

k.  That the legal fee to be paid by Old Alternus would be capped at $50,000.00;

l.  Old Alternus would transfer the sum Defendants paid to acquire the shares of Old Alternus as described above in which event Defendants' "basis" in the shares held was $0.00;

322.  Before the business combination closing between Alternus-Ireland and "Old\ Alternus", Defendants purchased 2,896,554 shares of Old Alternus as provided for in the agreement.

323.  On or about December 23, 2023, the Business combination was completed, and

the company was renamed "Alternus Clean Energy, Inc." (" New Alternus").

324. Upon the completion of the combination, Defendants received the agreed to shares of the newly formed company in exchange for the shares of the SPAC that it had purchased pre-merger.

325. In compliance with the funding agreement with Defendants, New Alternus paid/reimbursed Defendants, Meteora the sum it had purchased the SPAC shares of Old Alternus.

326. As a result, Defendants were holding New Alternus shares at a $0.00 cost basis.

327. New Alternus began trading on the NASDAQ exchange on or about December 26, 2023.

328. While Defendants held approximately 9.9% of the issued stock of "New Alternus", Defendants and Alternus-Ireland held 80% of the issued shares of "New Alternus" , Defendants therefore had significant control over the "float" of the stock.

329. Initially after the business combination closed, the  share price of Plaintiff on the NASDAQ was expected to open and did open at approximately $5.00/share.

330. Based upon the oral representations made by Defendants, which were incorporated in the agreements between the parties, New Alternus had a reasonable expectation that Defendants would not be selling shares of stock in the market during the first 90 days after trading began on the NASDAQ exchange less than the price of $10.00/share in which event Defendants would remit to New Alternus the sum of $10.00 per share, which funds would be available for use as operating capital by New Alternus.

331. Based upon the representations and circumstances surrounding the agreements,

36

Defendants knew that Plaintiff was relying upon Defendants not to sell any shares of New Alternus during the first 90 days after trading began on the NASDAQ exchange less than the price of $10.00/share unless and until the share price was above $10.00 per share.

332.    Based upon the representations and circumstances surrounding the agreements, Defendants knew that Plaintiff was relying upon Defendants not to sell any shares of New Alternus after the first 90 days after trading began on the NASDAQ exchange except to reimburse Defendants for the $500,000.00 advanced to New Alternus plus the 17% fee unless the share price exceeded $10.00/share.

333.    Defendants knew that it was reasonable for New Alternus to rely upon Defendants representations that Defendants were going to sell shares in the market when the share price was above $10.00 per share.

334.    Defendants knew that New Alternus expected Defendants to disclose that Defendants were selling shares in the market when the share price was above $10.00 per share and that Defendant would remit those funds to New Alternus.

335.    It was reasonable that New Alternus expected Defendant to report the sales of the shares of stock it was holding in escrow to New Alternus.

336.    It was reasonable that New Alternus expected Defendants to remit to New Alternus the sum of $10.00/share for every share that Defendants sold other than those shares sold after 90 days of trading to reimburse Defendants for the advanced $500,000.00 and 17% fee.

337.    Defendants were aware that New Alternus was relying upon the funds expected to

37

receive from Defendants pursuant to the agreements upon the sale of the shares of New Alternus that Defendants were holding pursuant to the above-described scheme.

338.    Notwithstanding the reasonableness of the foregoing and Defendants' knowledge of the reasonableness of the foregoing, Defendants never intended to remit the funds to New Alternus as it sold shares of stock that it was holding pursuant to the outlined "scheme".

339.    Notwithstanding the reasonableness of the foregoing and Defendants' knowledge of the reasonableness of the foregoing, Defendants intended to sell the shares of New Alternus without disclosing the sales to New Alternus.

340.    The representations made by Defendants orally and in the agreements were false.

341.    Defendants knew that the foregoing representations were false.

342.    Defendants knew that the New Alternus was relying upon the truth of the representations and as a result New Alternus was induced into entering into the stock arrangement as outlined hereinabove.

343.    In fact, Defendants did sell shares of New Alternus's stock in the market when the share price was above $10.00 per share.

344.    Defendant's failed to remit any funds to New Alternus based upon the sale of shares in the market as was required by the agreements between the parties.

345.    By reason of the foregoing, New Alternus was damaged.

346.    In addition to the foregoing, contrary to the agreement with New Alternus, Defendants sold an excess number of shares to the point that Defendants sale of shares significantly affected the market price of New Alternus shares.

347.    As a result of Defendants stock manipulation, the price of the New Alternus stock

38

decreased below $1.00 per share.

348.   The price per share of New Alternus stock never rebounded and never sold above the pre-agreed strike price of $10.00 per share.

349.   Upon information and belief Defendants sold shares of New Alternus's during the first 90 days after trading began on December 26,2023 in which it received in excess of $1,000,000.00.

350.   Defendant did not remit any of the revenue received from the sales of New Alternus stock.

351.   Defendants intentionally failed and/or refused to advise New Alternus of the sales of stock to New Alternus.

352.   Initially Defendants denied having sold any shares of New Alternus during the first 90 days then later admitted to selling shares.

353.   By reason of the foregoing, New Alternus was unaware of the sale of shares by Defendants and was unaware that Defendants has failed to pay New Alternus over $1,000,000 pursuant to the agreements between the parties.

354.   At no time did Defendants remit any money to New Alternus as required by the agreement between the parties.

355.   As provided for in the agreements except for those shares sold for the purposes of reimbursing Defendant for the funds advanced to New Alternus as permitted in the agreement, plus the 17% fee to defendants, all other shares sold by defendants required defendant to remit to New Alternus $10.00 per share.

356.   Upon information and belief, Defendants do not deny that shares of New Alternus

39

were sold, that Defendants received payment for the sale of shares of New Alternus and that Defendants did not remit the payment to Plaintiff.

357. Upon information and belief, Defendants have embarked on and implemented the scheme as outlined and set forth hereinabove, tailored to specific circumstances as required by the circumstances of the SPAC's arrangements/agreements with the targeted operating company.

358. More specifically, Defendants embarked upon and implemented a scheme whereby they gained control of shares in newly public companies post-SPAC merger at a zero-cost basis.

359. More specifically, in furtherance of the scheme, the shares obtained by Defendants from post-SPAC merged companies were unrestricted.

360. More specifically, in furtherance of the scheme, Defendants represented to their "targets" that when they sold the "Target's" shares, Defendants would remit a pre-agreed price per share to the "Target".

361. More specifically, the agreement entered into with each of its targets permitted Defendants to retain all proceeds of the sale of the "Target's" shares in excess of the pre-agreed price per share Defendants were required to remit to the "Target".

362. More specifically, while Defendants were not prohibited from selling shares of the "Target" below the pre-agreed price, regardless of the actual sale price, Defendants were contractually required to remit to the "Target" the per share pre-agreed price.

363. Notwithstanding the foregoing, pursuant to the scheme, Defendants sold shares of the "Target" regardless of the then market price, did not disclose the sales to the "Target" and did not remit the funds from the sale of stock to the "Target".

364.    Defendants repeatedly lied and misrepresented to "targets" about how many shares they owned to obscure the fact that they had made sales of shares and profited from such sales.

365.    The result of the foregoing scheme was that the "target's" market share price was materially damaged, and the "targets" had not received any compensation due from the sales of such shares.

366.    Additional "targets" of Defendants' scheme shall be identified in discovery of this action, which, upon information and belief will include the business arrangement between Defendants and "Ocean Biomedical, Inc.", which dispute is presently pending before Judge Anar Patel in the Supreme Court of the State of New York, County of New York.

367.    Pursuant to paragraph (a)(i) of the "other provisions" of the Funding agreement, between New Roadzen and Defendants, referring to SEC Rule 10b-5, Defendants represented that Defendants were not

   "…entering into the transaction to create actual or apparent trading activity in the shares of (or any Security convertible into or exchangeable for the shares) or raise or depress or otherwise manipulate the price of the shares (or any Security convertible into or exchangeable for the shares) for the purpose of inducing the purchase or sale of such securities or otherwise, in violation of the exchange act, and…" defendants "… represents and warrant to…" Vahanna and Old Roadzen that defendants "… has not entered into or altered, and agrees that (defendant) will not enter into or alter, any corresponding or hedging transaction or position **with respect of the shares…**" **<u>that are being held as collateral security.</u>**

368.    Pursuant to paragraph (a)(iii) of the "other provisions" of the funding agreement with New Roadzen, Defendants further

41

"… acknowledges, and agrees that any amendment, modification, waiver, or termination of this confirmation must be effected in accordance with the requirements for the amendment or termination of a written trading plan for trading securities. **Without limiting the generality of the foregoing, (defendants) acknowledges and agrees that amendment modification, waiver, or termination shall be made in good faith, and not as part of a plan or scheme to evade compliance with the federal securities laws, including without limitation the prohibition on manipulative and deceptive devices under the exchange act**, **and no such amendment**, modification, or waiver, shall be made at any time **at which (defendant) or any officer, director, manager or similar person of "defendant" is aware of any material non-public information regarding (defendant) or the shares…**"

369.    Pursuant to paragraph (i) of the "other provisions" of the funding agreement

**Defendants further represent that the transaction is intended to be a "securities contract"** and a "swap agreement" as defined by the United States bankruptcy code.

370.    Notwithstanding the afore-stated "other provisions" of the funding agreements, the funding agreements were in fact designed and entered into by Defendants for the "…purpose of inducing the purchase or sale of such securities or otherwise, in violation of the exchange act".

371.    Notwithstanding the afore-stated "other provisions" of the funding agreements, the representation that defendants "… has not entered into or altered and agrees that (defendant) will not enter into or alter, any corresponding or hedging transaction or position with respect of the shares…" that are being held as collateral security was a false statement and representation and Defendants knew that such representation was false when made.

372.    The entire "funding scheme" as set forth in more detail hereinabove was a

42

carefully thought out and implemented plan and scheme to evade compliance with the federal securities laws, including without limitation the prohibition on manipulative and deceptive practices under the exchange act.

373.    The individually named Defendants who were officers members, managing members and partners of the "business named" Defendants {"Meteora"}were fully aware and complicit in proposing and implementing the foregoing detailed plan and scheme.

374.    Plaintiff relied upon the foregoing representations made by Defendants in furtherance of the plan and scheme as set forth in more detail hereinabove in entering into the funding agreement with Defendants.

375.    Defendant knew that Plaintiff was relying upon those representations in entering into the funding agreement with Defendants.

376.    Plaintiffs reliance on the foregoing representations was reasonable.

377.    Defendants knew that Plaintiffs reliance on the foregoing representations was reasonable.

378.    Defendants knew that the forgoing representations were false when made.

379.    Plaintiff entered into the foregoing funding agreements to its detriment.

380.    Defendants made the foregoing representations to induce Plaintiff into entering into the funding agreements with Defendants.

381.    By reason of Plaintiff's reliance on the foregoing Plaintiff has been damaged.

## FIRST CAUSE OF ACTION
### (FRAUD and FRAUD in the INDUCEMENT)
### (Against all Defendants)

382.    Plaintiff repeats, realleges and reiterates each and every allegation

43

contained in paragraphs "1" through "381" as though fully set forth herein.

383. By reason of the foregoing, Defendants fraudulently induced Old Roadzen and Vahanna to enter into the Funding Agreements as Amended.

384. By reason of the foregoing, Defendants fraudulently induced New Roadzen and Vahanna to enter into the Funding Agreements as Amended.

385. By reason of the foregoing, Mittal fraudulently induced Old Roadzen and Vahanna to enter into the Funding Agreements as Amended.

386. By reason of the foregoing, Levy fraudulently induced Old Roadzen and Vahanna to enter into the Funding Agreements as Amended.

387. By reason of the foregoing, Gahwyler fraudulently induced Old Roadzen and Vahanna to enter into the Funding Agreements as Amended.

388. By reason of the foregoing, Rogano fraudulently induced Old Roadzen and Vahanna to enter into the funding agreements as amended.

389. By reason of the foregoing, Mittal fraudulently induced New Roadzen to enter into the funding agreements as amended.

390. By reason of the foregoing, Levy fraudulently induced New Roadzen to enter into the funding agreements as amended.

391. By reason of the foregoing, Gahwyler fraudulently induced New Roadzen to enter into the funding agreements as amended.

392. By reason of the foregoing, Rogano fraudulently induced New Roadzen to enter into the funding agreements as amended.

393. Mittal intentionally induced Plaintiff to enter into the funding agreements as

44

amended with the intent to defraud Plaintiff as more fully set forth hereinabove including but not limited to:

a. Selling Roadzen shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

b. In fraudulently entering into the Amendment to the Forward Purchase Agreement to induce Plaintiff to request advances of funds for operating capital when Defendants intent was to withhold advances in an attempt to claim a downward recalculation of the "shortfall" or "strike" price to cover-up Defendants wrongful sales of Plaintiff's stock without remitting the pre-agreed $10.76/share;

c. In fraudulently manipulating the Roadzen stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

d. In creating a windfall profit to Defendants; and

e. In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

394.    Levy intentionally induced Plaintiff to enter into the funding agreements as amended with the intent to defraud Plaintiff as more fully set forth hereinabove, including but not limited to:

45

a. Selling Roadzen shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

b. In fraudulently entering into the Amendment to the Forward Purchase Agreement to induce Plaintiff to request advances of funds for operating capital when Defendants intent was to withhold advances in an attempt to claim a downward recalculation of the "shortfall" or "strike" price to cover-up Defendants wrongful sales of Plaintiff's stock without remitting the pre-agreed $10.76/share;

c. In fraudulently manipulating the Roadzen stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

d. In creating a windfall profit to Defendants; and

e. In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

395.    Gahwyler intentionally induced Plaintiff to enter into the funding agreements as amended with the intent to defraud Plaintiff as more fully set forth hereinabove, including but not limited to:

a. Selling Roadzen shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

46

b.  In fraudulently entering into the Amendment to the Forward Purchase Agreement to induce Plaintiff to request advances of funds for operating capital when Defendants intent was to withhold advances in an attempt to claim a downward recalculation of the "shortfall" or "strike" price to cover-up Defendants wrongful sales of Plaintiff's stock without remitting the pre-agreed $10.76/share;

c.  In fraudulently manipulating the Roadzen stock price with the goal of significantly reducing Defendants' obligation to Plaintiff or significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

d.  In creating a windfall profit to Defendants; and

e.  In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

396.    Rogano intentionally induced Plaintiff to enter into the funding agreements as amended with the intent to defraud Plaintiff as more fully set forth hereinabove, including but not limited to:

a.  Selling Roadzen shares of stock in which Defendants has and had a $0.00 basis and then failing and refusing to remit the pre-agreed funds for the sale of each share to Plaintiff;

b.  In fraudulently entering into the Amendment to the Forward Purchase Agreement to induce Plaintiff to request advances of funds for operating capital when Defendants intent was to withhold advances in an attempt to claim a downward recalculation of the

47

"shortfall" or "strike" price to cover-up Defendants wrongful sales

of Plaintiff's stock without remitting the pre-agreed $10.76/share;

c.  In fraudulently manipulating the Roadzen stock price with the goal

of significantly reducing Defendants' obligation to Plaintiff or

significantly increasing Plaintiff's obligation to Defendant that was

required to be made at the termination of the contract;

d.  In creating a windfall profit to Defendants; and

e.  In manipulating the stock sales to create a net gain to Defendants

to the detriment of Plaintiff.

397.    Defendants, Meteora intentionally induced Plaintiff to enter into the funding

Agreements as amended with the intent to defraud Plaintiff as more fully set forth

hereinabove, including but not limited to:

a.  Selling Roadzen shares of stock in which Defendants has and had a

$0.00 basis and then failing and refusing to remit the pre-agreed

funds for the sale of each share to Plaintiff;

b.   In fraudulently entering into the Amendment to the Forward

Purchase Agreement to induce Plaintiff to request advances of

funds for operating capital when Defendants intent was to withhold

advances in an attempt to claim a downward recalculation of the

"shortfall" or "strike" price to cover-up Defendants wrongful sales

of Plaintiff's stock without remitting the pre-agreed $10.76/share;

c.  In fraudulently manipulating the Roadzen stock price with the goal

of significantly reducing Defendants' obligation to Plaintiff or

48

significantly increasing Plaintiff's obligation to Defendant that was required to be made at the termination of the contract;

d. In creating a windfall profit to Defendants; and

e. In manipulating the stock sales to create a net gain to Defendants to the detriment of Plaintiff.

398. New Roadzen relied upon the representations made by Meteora, Rogano, Mittal, Levy and Gahwyler that Meteora would remit the sum of $10.76/share for every sale of Roadzen stock sold by Defendants.

399. New Roadzen's reliance upon the representations made by Meteora, Rogano, Mittal, Levy and Gahwyler that Defendants would remit the sum of $10.76/share for every sale of New Roadzen stock sold was reasonable under the circumstances.

400. Defendants knew that the foregoing representations were false when made.

401. Defendants knew that the ongoing representations that Defendants had not been selling shares of New Roadzen stock was false.

402. Defendants knew that the foregoing representations were false when made.

403. Defendants knew that Plaintiff was relying upon those representations as true.

404. Defendants knew that Plaintiffs reasonably relied upon those false representations made by Defendants.

405. Mittal was the person who arranged for and promoted the foregoing agreements, and devised, orchestrated and implemented the foregoing scheme.

406. Levy was the person who arranged for and promoted the foregoing agreements, and devised, orchestrated and implemented the foregoing scheme.

407. Gahwyler was the person who arranged for and promoted the foregoing

49

agreements, and devised, orchestrated and implemented the foregoing scheme.

408.    Rogano was the person who arranged for and promoted the foregoing agreements, and devised, orchestrated and implemented the foregoing scheme.

409.    By reason of the foregoing, Plaintiff was fraudulently induced into entering the business arrangement with Defendants as more fully set forth herein.

410.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses of this lawsuit.

411.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

**SECOND CAUSE OF ACTION**
**(MISREPRESENTATION)**
**(Against all Defendants)**

412.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "411" as though fully set forth herein.

413.    Defendants, individually and jointly, both orally and in writing made a series of representations to Plaintiff to induce Plaintiff to enter into the initial funding agreement and thereafter the amendment to the funding agreement some of which have been set forth in detail hereinabove.

414.    The representations made by Defendants include but are not limited to the following:

a.    That in exchange for Defendants, Meteora assisting in the de-SPAC process [which included a. purchasing shares of the  SPAC;

b. after the merger between Vahanna and "Old Roadzen", assisting in the forward funding of Plaintiff, "New" Roadzen by the issuance of a total of 5,000,000 shares of post-SPAC stock of Plaintiff, which shares were then being traded on the NASDAQ exchange; c. the return of 100% of the funds advanced/paid by Meteora for the SPAC shares thus resulting in a $0.00 cost basis for Meteora] and in exchange thereof, Defendants promised and represented both in writing and orally that Meteora would from time to time sell shares of Roadzen stock that Defendants were holding in escrow and pay to Plaintiff the sum of $10.76/share for each share that it sold and Defendant, Meteora would be permitted to retain any excess over $10.76/share it received;

b. That Defendants would notify Plaintiff every time it sold shares of Roadzen stock;

c. That, notwithstanding the fact that the 5,000,000 shares of stock issued to Defendant, Meteora, pursuant to the agreements between the parties represented approximately 9.9% of the issued shares of Plaintiff, and a much larger percentage of the unrestricted stock that had been issued, and thereby Defendants' unfettered sales could have a negative impact on the stock price of Roadzen stock, Defendants represented that as sophisticated lenders, investors and participants in funding "post SPAC" companies, had the expertise and knowledge as to when and in what amounts sales of stock

51

could be accomplished without significantly affecting the stock price and at the same time provide the funding that Plaintiff required post de-SPAC;

d.   In connection with the Amendment to the Funding Agreement, Defendants promised and represented to Plaintiff that it would "advance" to Plaintiff the total sum of $5,000,000 in tranches of $500,000 in exchange for Plaintiff's consent to permit Defendants to sell a portion of the 5,000,000 shares of Roadzen stock that Meteora had been issued for sums less than $10.76/share, however after Meteora had recovered the amounts advanced plus 17%, all further shares sold would require the payment of $10.76/share;

415.    Notwithstanding the foregoing representations, Defendants sold Roadzen stock without paying to Plaintiff $10.76/share as promised and represented.

416.    Notwithstanding the foregoing representations, Defendants failed and refused to advise Plaintiff every time they sold shares of Roadzen stock.

417.    Notwithstanding the foregoing representations, Defendants intentionally withheld information regarding its sales of Roadzen stock.

418.    Notwithstanding the foregoing representations, Defendants sales of Roadzen stock had a significant negative impact on the price of Roadzen stock post "de-SPAC".

419.    Notwithstanding the foregoing representations, Defendants manipulated the Roadzen stock to Plaintiff's detriment and to Defendants intended and calculated "benefit".

420. Notwithstanding the foregoing representations, Defendants failed and refused to advance the funding as provided in the Amendment to the Funding Agreement to Plaintiff's detriment.

421. By reason of the foregoing misrepresentations, Rogano induced Roadzen to enter into the Funding Agreement as Amended.

422. By reason of the foregoing misrepresentations, Mittal induced Roadzen to enter into the Funding Agreement as Amended.

423. By reason of the foregoing misrepresentations, Levy induced Roadzen to enter into the Funding Agreement as Amended.

424. By reason of the foregoing misrepresentations, Gahwyler induced Roadzen to enter into the Funding Agreement as Amended.

425. By reason of the foregoing misrepresentations, Meteora induced Roadzen to enter into the funding agreements as amended.

426. Defendant, Mittal, knew that the foregoing representations were false when made.

427. Defendant, Mittal, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

428. Defendant, Mittal knew that Plaintiff's reliance on the foregoing representations was reasonable.

429. Defendant, Mittal intentionally made the foregoing misrepresentations with the intent to cause Roadzen to enter into the Funding Agreement as Amended with the intent to defraud New Roadzen as more fully set forth hereinabove.

430. Defendant, Levy knew that the foregoing representations were false when made.

53

431. Defendant, Levy, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

432. Defendant, Levy knew that Plaintiff's reliance on the foregoing representations was reasonable.

433. Defendant, Levy intentionally made the foregoing misrepresentations with the intent to cause Roadzen to enter into the Funding Agreement as Amended with the intent to defraud New Roadzen as more fully set forth hereinabove.

434. Defendant, Gahwyler knew that the foregoing representations were false when made.

435. Defendant, Gahwyler, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

436. Defendant, Gahwyler knew that Plaintiff's reliance on the foregoing representations was reasonable.

437. Defendant, Gahwyler intentionally made the foregoing misrepresentations with the intent to cause Roadzen to enter into the Funding Agreement as Amended with the intent to defraud New Roadzen as more fully set forth hereinabove.

438. Defendant, Rogano knew that the foregoing representations were false when made.

439. Defendant, Rogano, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

440.    Defendant, Rogano knew that Plaintiff's reliance on the foregoing representations was reasonable.

441.    Defendant, Rogano intentionally made the foregoing misrepresentations with the intent to cause Roadzen to enter into the Funding Agreement as Amended with the intent to defraud New Roadzen as more fully set forth hereinabove.

442.    Defendant, Meteora knew that the foregoing representations were false when made.

443.    Defendant, Meteora, knew that Plaintiff was relying upon the truthfulness of the foregoing representations as the motivation of entering into the funding agreement with Meteora as amended.

444.    Defendant, Meteora knew that Plaintiff's reliance on the foregoing representations was reasonable.

445.    Defendant, Meteora intentionally made the foregoing misrepresentations with the intent to cause Roadzen to enter into the Funding Agreement as Amended with the intent to defraud New Roadzen as more fully set forth hereinabove.

446.    Roadzen relied upon the foregoing representations made by Meteora, Rogano, Mittal, Levy and Gahwyler.

447.    Roadzen's reliance upon the representations made by Meteora, Rogano, Mittal, Levy and Gahwyler was reasonable under the circumstances.

448.    Based upon the representations made by Meteora, Rogano, Mittal, Levy and Gahwyler, Plaintiff, Roadzen entered into the funding agreements as amended.

449.    As the person who arranged for the financing of the foregoing acquisition, Mittal devised and orchestrated the foregoing scheme.

55

450.    As the person who arranged for the financing of the foregoing acquisition,

Levy devised and orchestrated the foregoing scheme.

451.    As the person who arranged for the financing of the foregoing acquisition,

Gahwyler devised and orchestrated the foregoing scheme.

452.    As the person who arranged for the financing of the foregoing acquisition,

Rogano devised and orchestrated the foregoing scheme.

453.    By reason of the misrepresentations set forth herein and the wrongful conduct of

the Defendants in causing and directing Meteora to cease making the payments required

pursuant to the funding agreements as amended with Roadzen, in failing to notify

Plaintiff of sales of stock when made, in failing to advance funds to Roadzen when

requested, and in manipulating the stock price of Roadzen stock,  Roadzen was damaged

in an amount to be determined at trial.

454.     By reason of the foregoing, Plaintiff has been damaged in a sum to be determined

at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses

of this lawsuit.

455.    By reason of the foregoing, Plaintiffs demand punitive damages against all

Defendants plus reasonable legal fees and the costs and disbursements of bringing this

action.

**THIRD CAUSE OF ACTION**
**(Declaratory Judgement-Piercing the Corporate Veil)**
**(Against all Defendants)**

456.    Plaintiff repeats, realleges and reiterates each and every allegation

contained in paragraphs "1" through "455" as though fully set forth herein.

457.    Rogano exercised complete domination of Meteora in perpetrating the foregoing

56

acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Roadzen as more fully set forth hereinabove.

458. Mittel exercised complete domination of Meteora in perpetrating the foregoing acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Roadzen as more fully set forth hereinabove.

459. Levy exercised complete domination of Meteora in perpetrating the foregoing acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Roadzen as more fully set forth hereinabove.

460. Gahwyler exercised complete domination of Meteora in perpetrating the foregoing acts, actions, fraudulent conduct and misrepresentations as against Plaintiff, Roadzen as more fully set forth hereinabove.

461. The foregoing domination was used by Rogano to perpetrate and commit the fraud and wrongdoing against Plaintiff, Roadzen as more fully set forth hereinabove.

462. The foregoing domination was used by Mittal to perpetrate and commit the fraud and wrongdoing against Plaintiff, Roadzen as more fully set forth hereinabove.

463. The foregoing domination was used by Levy to perpetrate and commit the fraud and wrongdoing against Plaintiff, Roadzen as more fully set forth hereinabove.

464. The foregoing domination was used by Gahwyler to perpetrate and commit the fraud and wrongdoing against Plaintiff, Roadzen as more fully set forth hereinabove.

465. Rogano utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Roadzen.

466. Mittal utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Roadzen.

467. Levy utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Roadzen.

468. Gahwyler utilized the Meteora "corporate entities" to perpetrate the foregoing described fraud and misrepresentations against Plaintiff, Roadzen.

469. The Meteora "corporate entities" were the "alter ego" of Rogano with regard to his actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Roadzen to enter into the Funding Agreement as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

470. The Meteora "corporate entities" were the "alter ego" of Mittal with regard to his actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Roadzen to enter into the Funding Agreement as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

471. The Meteora "corporate entities" were the "alter ego" of Levy with regard to his actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Roadzen to enter into the Funding Agreement as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

472. The Meteora "corporate entities" were the "alter ego" of Gahwyler with regard to his actions as set forth above, including but not limited to the fraudulent conduct as set forth hereinabove in causing Plaintiff, Roadzen to enter into the Funding Agreements as Amended with the intent to deceive Plaintiff as more fully set forth hereinabove.

473. By reason of the foregoing the Meteora corporate form should be disregarded to achieve an equitable result.

474. By reason of the foregoing Defendant, Rogano should be personally responsible

for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Roadzen.

475.   By reason of the foregoing Defendant, Mittal should be personally responsible for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Roadzen.

476.   By reason of the foregoing Defendant, Levy should be personally responsible for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Roadzen.

477.   By reason of the foregoing Defendant, Gahwyler should be personally responsible for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended with Plaintiff, Roadzen.

478.   By reason of the foregoing, Plaintiffs request that this Court, as a Court of equity prevent the wrong committed upon Plaintiffs and issue a declaratory judgment declaring that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler shall each be jointly and severally personally responsible and liable for the breach and other wrongful conduct of Defendant, Meteora in connection with the funding agreements as amended between Meteora and Roadzen.

### FOURTH CAUSE OF ACTION
### (BREACH OF CONTRACT)
### (Against Defendants all Defendants)

479.   Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "478" as though fully set forth herein.

59

480.    Plaintiff, Roadzen has complied in all respects with the terms and conditions of the funding agreement as amended with Defendants, Meteora.

481.    Defendant, Meteora has breached multiple terms and conditions of the Funding Agreement as amended with Plaintiff, Roadzen as more fully set forth hereinabove, including but not limited to:

a. Defendants', Meteora's failure to pay Plaintiff as required under the agreements,

b. Meteora's failure to report sales of Roadzen stock to Plaintiff,

c.  Meteora's failure and refusal to fund Roadzen as provided in the amendment to the funding agreement; and

d.  Meteora's wrongful manipulation of the Roadzen stock resulting in its market loss.

482.    By reason of the foregoing, Defendants Meteora breached the Funding Agreements as Amended.

483.    On the condition that this Honorable Court grants Plaintiff, Roadzen's application for a Declaratory Judgement that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler shall each be jointly and severally personally responsible and liable for the breach of the funding agreements as amended between Meteora and Roadzen, Plaintiff, Roadzen demands judgment against each corporate/business Defendant as well as against each individually named Defendant jointly and severally for the breach of the funding agreements as amended.

484.     By reason of the breach of contract as more fully set forth herein and the wrongful conduct of the Defendants as more fully set forth herein, New Roadzen was damaged in an amount to be determined at trial.

60

485.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses of this lawsuit.

## FIFTH CAUSE OF ACTION
## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)
## (Against Defendants all Defendants)

486.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "485" as though fully set forth herein.

487.    Within the Funding Agreements as Amended, there is an implied covenant of good faith and fair dealing.

488.    Defendants owe and owed Plaintiff, Roadzen a duty to act in good faith and conduct the business affairs with Plaintiff in a fair and equitable manner.

489.    Defendants breached the duty by engaging in transactions that drove down the market price of Roadzen shares and further failed to conduct themselves and itself consistent with the terms and conditions of the Funding Agreement as Amended.

490.    Plaintiff, Roadzen reasonably expected that Defendants would not engage in transactions as set forth hereinabove, which is implicit in the Funding Agreements as Amended.

491.    Defendants' breach of the implied covenant of good faith and fair dealing proximately caused New Roadzen to suffer damages in an amount to be determined at trial.

492.    By reason of the breach of covenant of good faith and fair dealing as more fully

61

set forth herein and the wrongful conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with New Roadzen, New Roadzen was damaged in an amount to be determined at trial.

493.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses of this lawsuit.

494.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

### SIXTH CAUSE OF ACTION
### (ACTION PURSUANT TO 18 USC §§ 1961-1968 {RICO CLAIM})
### (Against Defendants Mittal, Levy, Rogano and Gahwyler)

495.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "494" as though fully set forth herein.

496.    Meteora is an enterprise as defined in the RICO statutes.

497.    Rogano is an officer of Meteora.

498.    Rogano is an employee of Meteora.

499.    Rogano is an equity owner of Meteora.

500.    Rogano is a member of Meteora.

501.    Rogano is a managing member of Meteora

502.    Rogano is a member of the Board of Directors of Meteora.

503.    Rogano exercises and exercised management and control over Meteora.

504.    Mittal is an officer of Meteora.

62

505.    Mittal is an employee of Meteora.

506.    Mittal is an equity owner of Meteora.

507.    Mittal is a member of Meteora.

508.    Mittal is a managing member of Meteora

509.    Mittal is a member of the Board of Directors of Meteora.

510.    Mittal exercises and exercised management and control over Meteora.

511.    Levy is an officer of Meteora.

512.    Levy is an employee of Meteora.

513.    Levy is an equity owner of Meteora.

514.    Levy is a member of Meteora.

515.    Levy is a managing member of Meteora

516.    Levy is a member of the Board of Directors of Meteora.

517.    Levy exercises and exercised management and control over Meteora.

518.    Gahwyler is an officer of Meteora.

519.    Gahwyler is an employee of Meteora.

520.    Gahwyler is an equity owner of Meteora.

521.    Gahwyler is a member of Meteora.

522.    Gahwyler is a managing member of Meteora

523.    Gahwyler is a member of the Board of Directors of Meteora.

524.    Gahwyler exercises and exercised management and control over Meteora.

525.    Each of the individual named Defendants, acted in their respective

capacity as an employee and/or officer and/or director and/or member and/or managing

member and/or equity owner of Meteora.

526. Each of the individual named Defendants participated in the wrongful conduct on behalf of Meteora, as more fully set forth hereinabove.

527. The Racketeering conduct alleged herein is the fraudulent conduct set forth hereinabove.

528. The pattern of racketeering activity alleged hereinabove includes but is not limited to the ongoing fraudulent policies and practice of the individual Defendants:

    a. Utilizing the Meteora "enterprise" to fraudulently induce Plaintiff to enter into the Funding Agreements as Amended;

    b. Utilizing the Meteora "enterprise" to induce the owners of those shares of New Roadzen stocks to enter into what appeared to be a lucrative funding agreement as amended with Meteora, as set forth above;

    c. Utilizing the Meteora "enterprise" to then fabricate claims that Plaintiff breached the Funding Agreements as Amended;

    d. Misrepresenting that Defendants would fund Plaintiff utilizing the New Roadzen stock Defendants Meteora were holding as collateral security with a $0.00 basis to Defendants Meteora, selling that stock in the market and remitting to Plaintiff $10.76/share, when it fact Defendants had no intention of remitting $10.76/share to Plaintiff thereby breaching the Funding Agreements as Amended and in fabricating other "reasons" that Meteora should not honor the terms and conditions of the Funding Agreement as Amended;

64

e. Utilizing the Meteora "enterprise" to fabricate reasons why Meteora should not honor the terms and conditions of the Funding Agreements as Amended; and

f. Utilizing the Meteora "enterprise" to obtain the assets of multiple shares of Roadzen stock without costs including the cost of continuing the funding of Plaintiff, Roadzen.

529. Further, the pattern of racketeering activity and the fraudulent policies and conduct of the Defendants as set forth in great detail hereinabove, has been ongoing since at least September 2024 and upon information and belief is still ongoing.

530. The result of the foregoing pattern of racketeering activity and the fraudulent policies and conduct of the Defendants, as set forth hereinabove was that Plaintiff, Roadzen, has been damaged in the sum in excess of $28,000,000.00 and have been caused to incur substantial legal fees and expenses.

531. The foregoing policies orchestrated by the Defendants has been and continues to be ongoing and repetitive as demonstrated hereinabove by the multiple specific transactions identified in detail hereinabove that followed the same pattern again and again.

532. As set forth hereinabove, Defendants have implemented the same or similar scheme on other companies including but not limited to Alternus and Oceans Biomedical as set forth hereinabove.

533. By reason of the repeated conduct and the wrongful conduct of the Defendants, as set forth hereinabove, there is every reason to believe that without court intervention, the conduct of the Defendants shall continue indefinitely into the future.

534.    The foregoing policy was part and parcel of the fraudulent conduct and scheme by Defendants to induce Roadzen to enter into the Funding Agreement as amended as well as induce other businesses seeking to "go public" to be lured into the same or similar "Funding Scheme" as set forth hereinabove.

535.    The damages as set forth herein were proximately caused by the violations of the RICO statutes (18 USC §§1961-1968 and more particularly 18 USC § 1965)

536.    By reason of the foregoing, Plaintiff was damaged as more fully set forth herein which was caused by the wrongful conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with Roadzen and withholding material information from Plaintiff, including the fact that Defendants wrongfully and in violation of the Funding Agreements as Amended failed to advise Plaintiff that Defendants were selling Roadzen stock and further promised to advance funding to Plaintiff.

537.    The foregoing was a Racketeering activity as described and set forth by the RICO statutes.

538.    The Fraud, Fraud in the Inducement and Misrepresentation violations as set forth hereinabove were incidental and tangential to the sale of securities as defined in SEC v Zandford [535 U.S. 813, 153 L.Ed.2d 1, 122 S.Ct. 1899].

539.    It is a question of fact for a jury to determine whether the facts as alleged herein are a "security transaction or a "commercial lending transaction".

540.    It is a question of law to determine whether the facts as alleged herein are a "security transaction or a "commercial lending transaction".

541.    Upon information and belief the same facts as set forth herein can be interpreted

as being based on a "security transaction" and a "commercial lending transaction" at the same time as defined in Bixler [596 F3d 751].

542. The issue of whether the facts and circumstances as set forth herein is a "security transaction" or a "commercial lending transaction" and whether the issue is a question of fact or a question of law are issues of "First Impression" .

543. Roadzen was damaged in an amount to be determined at trial.

544. By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses of this lawsuit.

545. By reason of the foregoing, Plaintiff demands punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

546. Pursuant to the RICO statutes, Plaintiff hereby demands treble damages plus attorney's fees and the costs of this lawsuit.

**SEVENTH CAUSE OF ACTION**
**(ACTION PURSUANT TO 15 USC § 77q(a)**
**(Against all Defendants)**

547. Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "546" as though fully set forth herein.

548. 15 USC §77(q)(a) provides as follows:

(a) **USE OF INTERSTATE COMMERCE FOR PURPOSE OF FRAUD OR DECEIT:**
It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a), (78) of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

**(1)**

to employ any device, scheme, or artifice to defraud, or

**(2)**

to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

**(3)**

to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

549.    15 USC §78(b) sets forth in detail the necessity of this regulation.

550.    By reason of the facts as set forth hereinabove, Defendants have violated 15 USC §77(q)(a).

551.    As set forth more fully hereinabove, Defendants have employed a scheme to defraud Plaintiff.

552.    As set forth more fully hereinabove, the scheme devised by Defendants was devised to obtain money unfairly, illegally and improperly by means of untrue statements of material fact, particularly in light of the circumstances under which they were made.

553.    As set forth more fully hereinabove, Defendants have engaged in a transaction and course of business which operates as a fraud and deceit upon the Plaintiff, Roadzen.

554.    The damages as set forth herein were proximately caused by the violations of 15 USC §§77q(a),

555.    By reason of the foregoing, as more fully set forth herein and the wrongful conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with Roadzen, Roadzen was damaged in an amount to be determined at trial.

556.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined

68

at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses of this lawsuit.

557.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

**EIGHTH CAUSE OF ACTION**
**(CAUSE OF ACTION PURSUANT TO 15 USC §78(j), and 17 USC**
**§§240.10b-5 and 240.10(b))**
**[STOCK MANIPULATION]**
**(Against all Defendants)**

558.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "557" as though fully set forth herein.

559.    15 USC §78(j)(b) provides as follows:

"…It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors…"

560.    17 USC § 240.10b-5 [a/k/a SEC Rule 10b-5] provides as follows:

"Employment of Manipulative and Deceptive Devices"

"…It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

69

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security…"

561.    SEC Rule 10b-5 prohibits fraud in connection with the purchase or sale of a security.

562.    Pursuant to SEC Rule 10b-5, fraud can occur in purchases made on a stock exchange.

563.    As set forth hereinabove, New Roadzen stock was and is listed and traded on the NASDAQ exchange.

564.    The contracts entered into between Defendants and Plaintiff was a "securities based swap agreement".

565.    Unbeknownst to Plaintiff, the Funding Agreements as Amended was and is manipulative in contravention of SEC Rule 10b-5 and 10(b).

566.    Unbeknownst to Plaintiff, the Funding Agreements as Amended was and is a deceptive device in contravention of SEC Rule 10b-5 and 10(b).

567.    Unbeknownst to Plaintiff, the Funding Agreements as Amended was and is a contrivance in contravention of SEC Rule 10b-5.

568.    Defendants employed the foregoing described "Scheme" to defraud Plaintiff.

569.    As more fully set forth hereinabove, Defendants made untrue statements both orally and in writing of material facts in connection with their manipulation of New Roadzen stock.

570.    As more fully set forth hereinabove, Defendants omitted material facts in

70

furtherance of the fraud, fraud in the inducement and misrepresentation causes of action set forth hereinabove, including but not limited to the fact that Defendants omitted notifying Plaintiff that it was selling shares of New Roadzen stock without Plaintiff's knowledge, without notifying Plaintiff as required by the Funding Agreements as Amended and in furtherance of the scheme to manipulate the New Roadzen stock.

571.    Defendants engaged in a course of business in furtherance of the above stated scheme which operated as a fraud upon any Plaintiff in connection with the sale of New Roadzen securities.

572.    As set forth in the facts hereinabove, Defendants manipulated the New Roadzen stock to Defendants' benefit and to Plaintiff's detriment.

573.    As more fully set forth hereinabove, Defendants made misstatements and omissions of material facts to induce Plaintiff to enter into the Funding Agreements as Amended.

574.    As more fully set forth hereinabove, Defendants made the foregoing misstatements and omissions of material facts with "scienter", that is with knowledge and awareness of the nature of their actions and the circumstances surrounding the forgoing wrongful actions.

575.    As more fully set forth hereinabove, Defendants made the foregoing misstatements and omissions of material facts in connection with the purchase or sale of securities.

576.    As more fully set forth hereinabove, Defendant made the foregoing misstatements and omissions of material facts knowing that Plaintiff was relying upon those statements of material fact as true.

577. The proximate cause of the damages sustained and alleged herein by Plaintiff was by reason of Plaintiff's reasonable reliance upon those statements and upon Plaintiff's good faith and reasonable belief that Defendants were acting in good faith and would not have omitted to advise Plaintiff of material facts, which, as set forth herein was the proximate cause of damages asserted herein.

578. By reason of the facts as set forth hereinabove, Defendants have violated 15 USC §77(q)(a).

579. As set forth more fully hereinabove, Defendants have employed a scheme to defraud Plaintiff.

580. As set forth more fully hereinabove, the scheme devised by Defendants was devised to obtain money unfairly, illegally and improperly by means of untrue statements of material fact and manipulation of the stock price, particularly in light of the context and circumstances under which they were made.

581. As set forth more fully hereinabove, Defendants have engaged in a transaction and course of business which operates as a fraud and deceit upon the Plaintiff, Roadzen.

582. The damages as set forth herein were proximately caused by the violations of 15 USC §77q(a).

583. The damages as set forth herein were proximately caused by violations of the 17 USC §240.10b-5 [SEC Rule 10b-5].

584. By reason of the foregoing, as more fully set forth herein and the wrongful conduct of the Defendants in causing and directing Meteora to fail to make the payments required pursuant to the funding agreements as amended with Plaintiff, Roadzen, Roadzen was damaged in an amount to be determined at trial.

585.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses of this lawsuit.

586.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

## NINTH CAUSE OF ACTION
## (UNJUST ENRICHMENT)
## (Against all Defendants)

587.    Plaintiff repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "586" as though fully set forth herein.

588.    Plaintiff, Roadzen has complied in all respects with the terms and conditions of the Funding Agreement as amended with Defendants, Meteora.

589.    Defendant, Meteora has breached multiple terms and conditions of the Agreements with Plaintiff, Roadzen as more fully set forth hereinabove, including but not limited to Defendants failure to pay Plaintiff as required under the agreements, Defendants failure to advise Plaintiff when shares of stock were sold, Defendants, Meteora's failure to advance funds as required under the Funding Agreement as amended, and Defendants wrongful manipulation of the Roadzen stock resulting in its market loss.

590.    By reason of the foregoing, Defendants Meteora breached the Funding Agreements as Amended.

591.    By reason of the foregoing, Defendants have been unjustly enriched.

73

592.    On the condition that this Honorable Court grants Plaintiff, Roadzen's application for a Declaratory Judgement that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler shall each be jointly and severally personally responsible and liable for the breach of the funding agreements as amended between Meteora and Roadzen, Plaintiff, Roadzen demands judgment against each Defendant jointly and severally for the breach of the funding agreements as amended and thereby have been individually unjustly enriched.

593.    By reason of the foregoing as more fully set forth herein and the wrongful conduct of the Defendants in causing and directing Meteora to cease making the payments required pursuant to the funding agreements as amended with New Roadzen resulting, New Roadzen was damaged in an amount to be determined at trial.

594.    By reason of the foregoing, Defendants Meteora, Rogano, Mittal, Levy and Gahwyler have been unjustly enriched.

595.    By reason of the foregoing, Plaintiff has been damaged in a sum to be determined at trial but believed to be in excess of $28,000,000.00 plus interest and cost and expenses of this lawsuit.

596.    By reason of the foregoing, Plaintiffs demand punitive damages against all Defendants plus reasonable legal fees and the costs and disbursements of bringing this action.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

**FIRST CAUSE OF ACTION**:

Fraud and Fraud in the Inducement as against all defendants. Plaintiff, ROADZEN demands that

74

damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Roadzen demands damages in an amount to be determined at trial but in no event less than $28,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**SECOND CAUSE OF ACTION:**

Misrepresentation against all defendants: Plaintiff, ROADZEN demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Roadzen demands damages in an amount to be determined at trial but in no event less than $28,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**THIRD CAUSE OF ACTION:**

Declaratory Judgment declaring that the Defendants herein have abused the corporate form, that the "corporate veil shall be pierced" and that Defendants, Rogano, Mittal, Levy and Gahwyler each be jointly and severally personally responsible and liable for all Causes of Action asserted herein.

**FOURTH CAUSE OF ACTION**:

Breach of Contract against all Defendants: Plaintiff, ROADZEN demands damages in the sum of $23,000,000 plus interest, attorneys fees and costs and expenses of the litigation against all Defendants. Plaintiff, Roadzen demands damages in an amount to be determined at trial but in no event less than $28,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation against all Defendants.

**FIFTH CAUSE OF ACTION:**

Breach of Covenant of Good Faith and Fair Dealing against all Defendants: Plaintiff, ROADZEN demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of

75

the litigation plus punitive damages against all Defendants. Plaintiff, Roadzen demands damages in an amount to be determined at trial but in no event less than $28,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**SIXTH CAUSE OF ACTION**:

Violations of the RICO statutes (18 USC §§1961-1968) against all Defendants and particularly against Defendants, Rogano, Mittal, Levy and Gahwyler: Pursuant to the RICO Statute, Plaintiff, ROADZEN demands damages in the sum of $28,000,000 plus interest, attorneys fees and costs and expenses of the litigation against all Defendants and particularly against Defendants, Rogano, Mittal, Levy and Gahwyler. Pursuant to the RICO statute, Plaintiff, Roadzen demands treble damages in an amount to be determined at trial but in no event less than treble the damages proved at trial believed to be a total of $84,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation against all Defendants;

**SEVENTH CAUSE OF ACTION**: Violations of the 15 USC §77(q)(a) against all Defendants:   Plaintiff, ROADZEN demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Roadzen demands damages in an amount to be determined at trial but in no event less than $28,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**EIGHTH CAUSE OF ACTION**: Violations of the 15 USC §78(j) and 17 USC §240.10b-5 against all Defendants:  Plaintiff, ROADZEN demands that damages be determined at Trial plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants. Plaintiff, Roadzen demands damages in an amount to be determined at trial but

76

in no event less than $28,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation plus punitive damages against all Defendants.

**NINTH CAUSE OF ACTION**:

Unjust Enrichment against all Defendants: Plaintiff, ROADZEN demands damages in the sum of $28,000,000 plus interest, attorneys fees and costs and expenses of the litigation against all Defendants. Plaintiff, Roadzen demands damages in an amount to be determined at trial but in no event less than $28,000,000.00 plus interest, attorneys fees and costs and expenses of the litigation against all Defendants.

And Such other and further relief as to this Court may deem just and proper.

Dated: New York, New York
       October 17, 2025

Shayne Law Group, P.C.

s/Richard E. Schrier
Richard E. Schrier, Esq.
262 W. 38th Street
New York, New York 10018
212-566-4949
resincourt@shaynelawgroup.com

77